# Richard H. Goldstein

July 16, 2024

The Honorable Stephen R. Clark
Chief District Judge
United States District Court for the Eastern District of Missouri
111 South 10th Street
St. Louis, MO 63102

   *Re:*   *United States of America v. John Pound (Case No. 4:22-cr-00699-SRC-1)*

Dear Judge Clark:

  My name is Richard H. Goldstein.  I am one of the victims of John Pound's criminal conduct and am writing to convey the devastating effects that his crimes have had on me and the lives of others.  It is my sincere hope that you will take this letter into consideration when you make the important decision to hold Mr. Pound fully accountable for his brazen crimes.

  While I am sure you will have information concerning Mr. Pound's crimes when it comes time for sentencing, my objective is to provide you with information concerning the effects – both human and financial – of his crimes that you may not have.  I will start with the financial effects.

  Mr. Pound stole money from an association ("Association") consisting of condominium owners as well as the corporation managing that Association.  Exhibit A is a report I commissioned showing the amounts unlawfully taken by Mr. Pound.  In sum, Mr. Pound stole $101,787.50 from the Association and $377,286.33 from the management company.  Thus, based on the records that were *available*, Mr. Pound stole a grand total of $479,073.83.  Please know that this amount is estimated as some records were not available due to Mr. Pound's deliberate malfeasance.

  The money stolen by Mr. Pound was just part of the financial devastation that he caused.  I personally spent $333,631.56 investigating the extent of the financial damage.  Exhibit B is a ledger showing the expenses associated with my investigation, which was greatly hindered by Mr. Pounds extensive efforts to conceal his myriad illegal activities.

  Although I understand that Mr. Pound's crimes can fairly be described as "financial," I want the Court to know that they had a very real "human" effect as well.  Mr. Pound stole hundreds of thousands of dollars from an Association of condominium owners and its management company.  His conduct placed the very existence of the Association in jeopardy.  In fact, had I not stepped in and given the Association funds, it would have been rendered insolvent.  Words cannot adequately describe the effect that this would have had on the condominium

owners.  Nor can they describe the disregard for these owners that Mr. Pound showed when he stole the above-described funds.

I suspect the Court will wonder whether Mr. Pound has any remorse for stealing massive amounts of money from the Association and its management company.  I can tell you that he has consistently shown a lack of remorse.  My statement is not based on speculation but rather Mr. Pound's own words.

I attach as Exhibit C a memorandum that Mr. Pound wrote to my attorney Bradley Blake in September 2020.  In that memorandum, Mr. Pound went to extraordinary lengths to explain and legitimize his theft (which, by the way, made my investigation astronomically more expensive).  Indeed, the memorandum consists of a seven page extremely detailed "explanation" for what we now know to be indisputable theft.  Personally, I would not be surprised if Mr. Pound still believes that he did nothing "wrong."

I have been informed that there are sentencing guidelines that you must follow when sentencing Mr. Pound.  That said, I cannot say strongly enough that Mr. Pound should be given the harshest sentence that is possible under the law.  As a forgiving man, I might feel differently if Mr. Pound had shown any contrition for his crimes.  But he has not.  To the contrary, he has shown nothing but a callous disregard for the rights and welfare of others.  In other words, he could not have cared less about the well-being of others.  Therefore, I do not believe Mr. Pound deserves any mercy from the Court.

In closing, I want to thank and express my appreciation to Your Honor for reading and considering this letter when sentencing Mr. Pound.  Of course, should the Court wish to hear anything more from me, I can be reached at (909) 377-3947.

Very truly yours,

*Richard H. Goldstein*

Richard H. Goldstein

EXHIBIT A

**INVESTIGATION FINDINGS REPORT**

**22 NORTH EUCLID COMMERCIAL CONDOMINIUMS ASSOCIATION**
**22 NORTH EUCLID MANAGEMENT, INC.**

**SEPTEMBER 29, 2020**

WILLIAMS
KEEPERS LLC
CERTIFIED PUBLIC ACCOUNTANTS & CONSULTANTS

2005 West Broadway, Suite 100, Columbia, MO 65203
OFFICE (573) 442-6171 FAX (573) 777-7800
3220 West Edgewood, Suite E, Jefferson City, MO 65109
OFFICE (573) 635-6196 FAX (573) 644-7240
www.williamskeepers.com

September 29, 2020


Mr. Brad Blake
Fellows & Blake, L.L.C.
13421 Manchester road, Suite 105
St. Louis, Missouri 63131


Dear Mr. Blake:

Pursuant to our engagement letter dated June 2, 2020 and signed by you on June 3, 2020, we have performed the following procedures related to an investigation of transactions executed by the then management agent of 22 North Euclid Commercial Condominiums Association (Association) and 22 North Euclid Management, Inc. (formally known as Manageable Information Systems, Inc):

1. We evaluated the financial information obtained and determined if additional information should be requested. We assisted with requests for additional information.

2. We evaluated, beginning with recent transactions, the business purpose of selected transactions with the management agent through supporting documentation and interviews with the representative of the management agent.

3. We interviewed the now former management agent in his Kirkwood, Missouri office on June 17, 2020, to obtain financial records and obtain an initial understanding of the situation. We conducted a second interview with the now former management agent in his Kirkwood, Missouri office on July 17, 2020, and discussed our initial findings with him.

This report outlines our findings regarding this investigation. The findings are attached to this letter as Investigation Findings on pages 2 through 14 which include Exhibits A - F. This letter and the attachments constitute our report.

This investigation was performed in accordance with Statement on Standards for Forensic Services No. 1 as issued by the Forensic and Valuation Services Executive Committee of the American Institute of Certified Public Accountants.


Sincerely,

*Williams-Keepers LLC*

WILLIAMS-KEEPERS LLC

Attachments

American Institute of Certified Public Accountants | Missouri Society of Certified Public Accountants | Member, Allinial Global

**22 NORTH EUCLID COMMERCIAL CONDOMINIUMS ASSOCIATION**
**22 NORTH EUCLID MANAGEMENT, INC.**

**INVESTIGATION FINDINGS**

*Background*

Our investigation was based on the terms of two similar but separate management agreements for two entities: 22 North Euclid Commercial Condominiums Association (Association) and Manageable Information Systems, Inc., now known as 22 North Euclid Management, Inc. (22 North Euclid). Both management agreements listed the management agent as Commercial Realty Management, Inc. represented by John Pound (Pound). Pound provided real estate management services to the entities and as part of his duties he maintained each entities' bank accounts and paid bills on their behalf. We used documentation of actual events to calculate the amounts due to the management agent under the terms of each section of the management agreements (management fee, commissions and hourly fee) and determined what should have been paid by each entity versus the amounts actually paid by the management agent to his company. The following is a summary of the terms of each entities' management agreement.

22 North Euclid Commercial Condominiums Association - Effective January 1, 2003, the Association executed a "Property Management Agreement" with Commercial Realty Management, Inc. represented by Pound. The "Property Management Agreement" basically included the following provisions:

- Management Fee - Required the management agent to maintain the property for an initial management fee of $450 per month through October 2008 when, effective November 1, 2008, the Association, documented in an email, increased the management fee to $550 per month.
- Hourly Fee - Upon specific approval by the Association, the management agent, for a $90 hourly fee, may provide other special services or consulting services that are not part of the management services.

22 North Euclid - Effective January 1, 2003, 22 North Euclid executed a separate "Property Management and Exclusive Leasing Agreement" with Commercial Realty Management, Inc. represented by Pound. The "Property Management and Exclusive Leasing Agreement" basically included the following provisions:

- Management Fee - Required the management agent to maintain the property for an initial management fee of $450 per month through October 2008 then, effective November 1, 2008, when the Association agreed to increase the management fee to $550 per month it appears and we assumed for this investigation, 22 North Euclid's fee also increased to the same amount of $550 per month.
- Commissions - Upon the signing of a new lease and occupancy by the tenant the management agent is due a commission of 3.0% of the gross rental payments with limitations based on the length of the lease.
- Commissions - Upon the signing of a lease renewal the management agent is due a commission of 1.5% of the gross rental payments with limitations based on the length of the lease.
- Commissions - Upon the signing of a lease expansion the management agent is due a commission of 2.0% of the gross rental payments for the expansion with limitations based on the length of the lease.

- Hourly Fee - Upon the specific approval by the owner, the management agent, for a $90 hourly fee, may provide other special services or consulting services that are not part of the management services.

Our investigation included the use of the following information:

- Paper documents obtained direct from Pound including documents for 2003 through 2019, excluding 2012 through 2014, for both entities. Paper documents for 2012 through 2014 for both entities suffered water damage while in storage and were destroyed by Pound.
- QuickBooks accounting system files obtained direct from Pound for 22 North Euclid.
- Some bank information for both entities obtained direct from each entities' bank.
- Accounting and tax return information from the Association's Certified Public Accountant.
- Discussions with and emails from Jim Rittenbaum, attorney who over the period of the management agreement served both entities.
- Interviews of Pound on June 17, 2020 and July 17, 2020.

We looked at individual transactions that cleared the bank accounts of each entity and were made payable to the management agent. Based on the description located on the image copy of the check, on the check stub or an invoice located in the files, we classified each payment based on its stated purpose. For payments to the management agent where we were unable to locate a description for the purpose of the payment, we classified the payment as a other unknown payment.

Our investigation period for commissions, hourly fees and the other unknown payments did not include 2003 through 2005 because as we evaluated periods beginning in 2020 and working back in time the amounts paid in excess of the contracted amounts decreased. Therefore, the determination was made to work back to January 1, 2006 and forgo evaluation of prior periods based on the working assumption the amounts prior to January 1, 2006 would not justify the cost to determine an additional loss, if any.

### *Summary of Loss*

The loss for purposes of this investigation is the amount the management agent paid his company in excess of the amount calculated as due based on the actual events and the terms of the management agreements. The total loss discussed in detail in the following paragraphs is at least $101,787.50 for the Association and at least $377,286.33 for 22 North Euclid. A Summary of Loss by entity and fee is included at Exhibit A, page 7 of this report.

### *Management Fee – Both Entities*

The management agreements for both entities have terms for the management agent to earn a management fee. The management agreements required the management agent to maintain the property for an initial management fee of $450 per month through October 2008 when, effective November 1, 2008 the Association agreed to increase the management fee to $550 per month. We did not locate any documentation increasing the management fee for 22 North Euclid but for purposes of this investigation because the terms of the management agreements were basically identical for the management agent to earn the management fee, when the Association increased the monthly rate we assumed the monthly rate also increased for 22 North Euclid.

From 2003 through 2009, the management agent paid his company per the terms of the management agreements.  Beginning in 2010 through June 30, 2020, the management agent arbitrarily increased the monthly fee to each entity (sometimes paying $650 and sometimes paying $750 per month) and paid the monthly fee more than 12 times per year (in 2011 the management agent paid his company 16 times from the Association).  The management agent prepared annual budgets for both entities for the members of the Association and the owner of 22 North Euclid to review.  Upon our review of the annual budgets for the Association for 2016, 2018 and 2020 and for 22 North Euclid for 2018 these four budgets all presented the monthly management fee as $550.  On July 17, 2020, when Pound was asked if he kept track of the payments he stated "he did at the time but did not retain any records" and further represented he was billing "based on the time being spent which was not the right way."

For the period January 1, 2003 through June 30, 2020, the amount of the management fee paid to the management agent in excess of the management fee calculated as due per the management agreement was $20,150.00 for the Association and $14,150.00 for 22 North Euclid.  A Management Fee Analysis by year is included at Exhibit B, page 8 of this report.

### Commissions – 22 North Euclid Only

The management agreement for 22 North Euclid included a commission structure for new, renewed and the expansion of tenant leases.  Upon the signing and occupancy of a new lease the management agent is due a commission of 3.0% of the gross rental payments, upon the signing of a lease renewal the management agent is due a commission of 1.5% of the gross rental payments and upon the signing of a lease expansion the management agent is due a commission of 2.0% of the gross rental payments for the expansion.  New, renewed and expanded leases have commission limitations and adjusted percentages based on the length of the lease.

Instead of paying lease commissions when due as outlined in the management agreement the management agent in 2009 began making payments to his company labeled as commissions when no commission was due.  On July 17, 2020, when Pound was asked why he didn't make the payments per the terms of the management agreement he stated "there was not always enough cash to make the commission payments when due so he spread the payments out over time."  Pound further stated "the 1.5% commission rate was not adequate as the lease commission renewal rate for the area was 5% so [he] tried to keep the commission rate in the 5% range."  Upon review of Pound's comment, based on the payments identified by the management agent as commissions paid to his company, the actual commission rate was in excess of 6%.  We located one commission invoice from April 2008 but did not find any others and when asked, Pound represented there are no other files to support any of the lease commissions.  Pound knew how he was calculating and paying the lease commissions was not per the terms of the management agreement and stated "he made the changes on his own" and "he should have talked to Jim [Rittenbaum] about modifying the terms of the management agreement but he had not."

For the period January 1, 2006 through June 30, 2020, the amount of commissions paid to the management agent in excess of the commissions calculated as due to the management agent per the management agreement was $221,525.76 for 22 North Euclid.  A Commission Analysis by year is included at Exhibit C, page 9 of this report.

### Hourly Fee – Both Entities

The management agreements for both entities have terms for the management agent to earn a $90 hourly fee for other special or consulting services that are not defined as management services included as part of the management fee. The management agent was not to undertake any special services or consulting services without the specific approval of the Association or the owner of 22 North Euclid. Based on our investigation we did not locate any evidence special or consulting services were provided or documentation of the approval for special or consulting services where the management agent could invoice either entity for an hourly fee. The only invoices we located during the period January 1, 2006 through June 30, 2020, were 16 invoices during 2011 submitted by the management agent to the Association and billed at $100 per hour but as previously stated there was no documentation these services were properly approved. On July 17, 2020, we asked Pound if he had obtained approval for the services billed as hourly fees as per the terms of the management agreements and he stated "he did not have approval from either entity." During our interview Pound represented he was asked by Jim Rittenbaum to provide hourly services for another entity owned by the owner of 22 North Euclid and he represented he paid for those services out of 22 North Euclid. It was pointed out to Pound the services provided to another entity is not the obligation of 22 North Euclid and he stated "that [22 North Euclid] was the only entity he had control of to pay himself." Subsequent to our discussions with Pound he submitted an invoice to the Association dated July 20, 2020, for 5.75 hours of services at an hourly rate of $130. The work outlined on the July 20, 2020, invoice was for normal maintenance and repair work as defined in Section 1.01 of the management agreements and should not have been billed separately on an hourly basis.

For the period January 1, 2006 through June 30, 2020, the amount of hourly fees paid to the management agent without specific approval by the Association or the owner of 22 North Euclid was $61,687.50 by the Association and $39,831.75 by 22 North Euclid. A Summary of Hourly Fee and Other Unknown Payments Analysis by year is included at Exhibit D, page 10 of this report.

### Other Unknown Payments – Both Entities

Other unknown payments represent checks made payable to the management agent where we were unable to locate a description for the purpose of the payment. During our interview of Pound on July 17, 2020, we asked if he could provide any additional documentation supporting any of these specific payments and he represented he could not.

For the period January 1, 2006 through June 30, 2020, the amount of other unknown payments paid to the management agent was $19,950.00 by the Association and $101,778.82 by 22 North Euclid. A Summary of Hourly Fee and Other Unknown Payments Analysis by year is included at Exhibit D, page 10 of this report.

### Payee Discrepancies in QuickBooks – 22 North Euclid Only

As a part of our investigation we identified payments to the management agent based on the payee on the image copies of checks included with the bank statements and compared them to the payee as entered into the QuickBooks accounting system maintained by the management agent. When we compared check image copies with the management agent as the payee to the same check as entered in QuickBooks we found numerous instances where the entry in QuickBooks was not recorded as the management agent as the payee, the amount of the payment was different or both.

The significance of this finding is the management agent provided information in QuickBooks to 22 North Euclid's owner's accountant to prepare the company's annual income tax return, but the accountant did not have access to the actual bank statements for the entity so she could not verify the payee. By the management agent not recording his company's name as the payee on payments to his company but instead listing other vendors as the payee in QuickBooks, the QuickBooks files understated payments made by the management agent to himself and concealed the actual payee from the owner's accountant.

For the period January 1, 2015 through December 31, 2019, we identified 132 transactions where the payee on the actual check that cleared the bank statement was the management agent but the payee entered in QuickBooks was not the management agent, the amount of the check that cleared the bank statement was not the amount posted in QuickBooks or both. The 132 transactions posted by the management agent accounted for under reported payments to his company of $191,349.26. A Payee Discrepancies in QuickBooks Analysis is included at Exhibit E, page 11 of this report.

*Meeting with Pound*

Included at Exhibit F, pages 12 through 14 is a memorandum of the meeting with Pound on July 17, 2020.

*Exhibits to this Report*

Exhibits A through F on pages 7 through 14 follow this page and are a part of this report and supplement the investigation findings.

**End of Report**

**22 North Euclid Commercial Condominiums Association**
**22 North Euclid Management, Inc.**
**Summary of Loss**

| | | 22 North Euclid Commercial Condominiums Association | 22 North Euclid Management, Inc. | Totals |
|---|---|---|---|---|
| Management fee paid in excess of management agreement (1) | Exhibit B | $ 20,150.00 | $ 14,150.00 | $ 34,300.00 |
| Lease commissions paid in excess of management agreement (2) | Exhibit C | - | 221,525.76 | 221,525.76 |
| Hourly fee paid in excess of management agreement (3) | Exhibit D | 61,687.50 | 39,831.75 | 101,519.25 |
| Additional payments not identified (4) | Exhibit D | 19,950.00 | 101,778.82 | 121,728.82 |
| Total Estimated Loss | | $ 101,787.50 | $ 377,286.33 | $ 479,073.83 |

Footnotes:

In preparing the above schedule, supporting records for the following are not available:
  - 22 North Euclid Commercial Condominiums Association - January 2012 - December 2014.
  - 22 North Euclid Management, Inc. - January 2012 - February 2013.

(1)  The loss covers the period from January 2003 - June 2020, excluding the periods noted above.

(2)  The loss covers the period from January 2006 - June 2020 for lease commissions, excluding the periods noted above.

(3)  No payments for hourly fees were approved as required by the Management Agreements.  The loss includes payments identified January 2006 - June 2020 for hourly fees, excluding the periods noted above.

(4)  Additional payments with no identification are included for the period from January 2006 to June 2020, excluding the periods noted above.

**22 North Euclid Condominiums Association**
**22 North Euclid Management, Inc.**
**Management Fee Analysis**
**For the Period January 1, 2003 Through June 30, 2020**

| | Management Fee Due | | | Management Fee Paid | | | Over (Under) Paid | | | Cumulative Over (Under) Paid | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Association | 22 North Euclid | Total | Association | 22 North Euclid | Total | Association | 22 North Euclid | Total | Paid | |
| 2003 | $ 5,400.00 | $ 5,400.00 | $ 10,800.00 | $ 4,950.00 | $ 4,950.00 | $ 9,900.00 | $ (450.00) | $ (450.00) | $ (900.00) | $ (900.00) | |
| 2004 | 5,400.00 | 5,400.00 | 10,800.00 | 5,850.00 | 5,850.00 | 11,700.00 | 450.00 | 450.00 | 900.00 | - | |
| 2005 | 5,400.00 | 5,400.00 | 10,800.00 | 4,950.00 | 5,400.00 | 10,350.00 | (450.00) | - | (450.00) | (450.00) | |
| 2006 | 5,400.00 | 5,400.00 | 10,800.00 | 5,850.00 | 5,400.00 | 11,250.00 | 450.00 | - | 450.00 | - | |
| 2007 | 5,400.00 | 5,400.00 | 10,800.00 | 5,400.00 | 5,400.00 | 10,800.00 | - | - | - | - | |
| 2008 | 5,600.00 | 5,600.00 | 11,200.00 | 5,600.00 | 5,600.00 | 11,200.00 | - | - | - | - | (1) |
| 2009 | 6,600.00 | 6,600.00 | 13,200.00 | 6,600.00 | 6,600.00 | 13,200.00 | - | - | - | - | |
| 2010 | 6,600.00 | 6,600.00 | 13,200.00 | 7,150.00 | 7,700.00 | 14,850.00 | 550.00 | 1,100.00 | 1,650.00 | 1,650.00 | |
| 2011 | 6,600.00 | 6,600.00 | 13,200.00 | 8,800.00 | 7,700.00 | 16,500.00 | 2,200.00 | 1,100.00 | 3,300.00 | 4,950.00 | |
| 2012 | 6,600.00 | 6,600.00 | 13,200.00 | 7,150.00 | 6,600.00 | 13,750.00 | 550.00 | - | 550.00 | 5,500.00 | (2),(3) |
| 2013 | 6,600.00 | 6,600.00 | 13,200.00 | 7,150.00 | 7,700.00 | 14,850.00 | 550.00 | 1,100.00 | 1,650.00 | 7,150.00 | (2) |
| 2014 | 6,600.00 | 6,600.00 | 13,200.00 | 9,100.00 | 9,100.00 | 18,200.00 | 2,500.00 | 2,500.00 | 5,000.00 | 12,150.00 | (2) |
| 2015 | 6,600.00 | 6,600.00 | 13,200.00 | 7,800.00 | 9,700.00 | 17,500.00 | 1,200.00 | 3,100.00 | 4,300.00 | 16,450.00 | |
| 2016 | 6,600.00 | 6,600.00 | 13,200.00 | 7,800.00 | 9,450.00 | 17,250.00 | 1,200.00 | 2,850.00 | 4,050.00 | 20,500.00 | |
| 2017 | 6,600.00 | 6,600.00 | 13,200.00 | 9,000.00 | 7,700.00 | 16,700.00 | 2,400.00 | 1,100.00 | 3,500.00 | 24,000.00 | |
| 2018 | 6,600.00 | 6,600.00 | 13,200.00 | 9,750.00 | 7,150.00 | 16,900.00 | 3,150.00 | 550.00 | 3,700.00 | 27,700.00 | |
| 2019 | 6,600.00 | 6,600.00 | 13,200.00 | 10,500.00 | 6,050.00 | 16,550.00 | 3,900.00 | (550.00) | 3,350.00 | 31,050.00 | |
| 2020 | 3,300.00 | 3,300.00 | 6,600.00 | 5,250.00 | 4,600.00 | 9,850.00 | 1,950.00 | 1,300.00 | 3,250.00 | 34,300.00 | (4) |
| Total | $ 108,500.00 | $ 108,500.00 | $ 217,000.00 | $ 128,650.00 | $ 122,650.00 | $ 251,300.00 | $ 20,150.00 | $ 14,150.00 | $ 34,300.00 | | |

Footnotes:

(1)  Per an October 23, 2008 email from Jim Rittenbaum, monthly fees increased from $450 per month to $550 per month for the Association beginning November 2008.
It is assumed the management fee for 22 North Euclid Management, Inc. increased to $550 at the same time as well.

(2)  Image copies of the cancelled checks for January 2012 - December 2014 for the Association were not available.
Management fees paid by the Association for January 2012 - December 2014 were obtained from tax return support as prepared by Sharamitaro & Associates, P.C.

(3)  Image copies of cancelled checks for January 2012 - February 2013 for 22 North Euclid Management, Inc. were not available.
Management fees paid by 22 North Euclid Management, Inc. for January 2012 - February 2013 were obtained from QuickBooks.

(4)  Data for 2020 only includes January - June 2020 (the first six months).

Exhibit C

**22 North Euclid Management, Inc.**
**Commission Analysis**
**For the Period January 1, 2006 Through June 30, 2020**

| | Commission Due | | | | Commission Paid | Over (Under) Paid | Cumulative Over (Under) Paid | Notes |
|---|---|---|---|---|---|---|---|---|
| | Pickles Deli, LLC | American Dental Partners of Missouri, LLC | Washington University | Total | | | | |
| 2006 | $ - | $ - | $ 11,902.80 | $ 11,902.80 | $ 11,902.00 | $ (0.80) | $ (0.80) | |
| 2007 | - | - | - | - | - | - | (0.80) | |
| 2008 | - | 9,721.32 | - | 9,721.32 | 9,729.42 | 8.10 | 7.30 | |
| 2009 | - | - | - | - | 1,811.07 | 1,811.07 | 1,818.37 | |
| 2010 | 1,935.89 | - | - | 1,935.89 | 9,000.00 | 7,064.11 | 8,882.48 | |
| 2011 | - | - | 7,588.04 | 7,588.04 | 9,193.20 | 1,605.16 | 10,487.64 | |
| 2012 | - | - | - | - | 12,050.00 | 12,050.00 | 22,537.64 | (1) |
| 2013 | - | 12,106.92 | - | 12,106.92 | 22,901.00 | 10,794.08 | 33,331.72 | (1) |
| 2014 | - | - | 5,379.03 | 5,379.03 | 32,880.00 | 27,500.97 | 60,832.69 | |
| 2015 | 1,758.78 | - | - | 1,758.78 | 41,757.70 | 39,998.92 | 100,831.61 | |
| 2016 | - | - | - | - | 37,218.74 | 37,218.74 | 138,050.35 | |
| 2017 | - | - | 5,981.20 | 5,981.20 | 29,102.00 | 23,120.80 | 161,171.15 | |
| 2018 | - | 11,606.39 | - | 11,606.39 | 30,365.00 | 18,758.61 | 179,929.76 | |
| 2019 | - | - | - | - | 29,091.00 | 29,091.00 | 209,020.76 | |
| 2020 | - | - | - | - | 12,505.00 | 12,505.00 | 221,525.76 | (2) |
| Total | $ 3,694.67 | $ 33,434.63 | $ 30,851.07 | $ 67,980.37 | $ 289,506.13 | $ 221,525.76 | | |

Footnotes:

(1) Image copies of cancelled checks for January 2012 - February 2013 for 22 North Euclid Management, Inc. were not available. Commissions paid during January 2012 - February 2013 were obtained from QuickBooks and were:

| | |
|---|---|
| Year of 2012 | $ 12,050.00 |
| Jan - Feb 2013 | 6,500.00 |
| Total | $ 18,550.00 |

(2) Schedule shows commissions calculated for lease renewals and payments made through June 30, 2020.

**22 North Euclid Commercial Condominiums Association**
**22 North Euclid Management, Inc.**
**Summary of Hourly Fee and Other Unknown Payments Analysis**
**For the Period January 2006 Through June 30, 2020**

| | | 22 North Euclid Commercial Condominiums Association | | 22 North Euclid Management, Inc. | |
|---|---|---|---|---|---|
| | | Hourly Fee | Other Unknown Payments | Hourly Fee | Other Unknown Payments |
| 2006 | | $ - | $ - | $ 2,857.50 | $ - |
| 2007 | | - | - | 1,039.50 | - |
| 2008 | | - | - | - | - |
| 2009 | | - | - | - | - |
| 2010 | | - | - | - | - |
| 2011 | | 31,600.00 | 16,350.00 | - | - |
| 2012 | (1) | N/A | N/A | N/A | N/A |
| 2013 | (1) | N/A | N/A | 1,087.50 | 42,050.00 |
| 2014 | (1) | N/A | N/A | 2,250.00 | 25,945.00 |
| 2015 | | 3,487.50 | - | 4,789.50 | 5,800.00 |
| 2016 | | 6,325.00 | - | 6,179.00 | 6,503.60 |
| 2017 | | 6,637.50 | - | 6,071.25 | 12,429.72 |
| 2018 | | 6,637.50 | 1,125.00 | 9,717.50 | 1,200.00 |
| 2019 | | 1,537.50 | 2,475.00 | 4,977.50 | 6,738.00 |
| 2020 | | 5,462.50 | - | 862.50 | 1,112.50 |
| Total Payments | | $ 61,687.50 | $ 19,950.00 | $ 39,831.75 | $ 101,778.82 |

Footnotes:

(1)    In preparing the above schedule, supporting records for the following are not available:
- 22 North Euclid Commercial Condominiums Association - January 2012 - December 2014.
- 22 North Euclid Management, Inc. - January 2012 - February 2013.

**22 North Euclid Management, Inc.**
**Payee Discrepancies in QuickBooks Analysis**
**Actual Payee on Cleared Check to Payee Posted in QuickBooks**
**For the Period January 1, 2015 - December 31, 2019**

This schedule presents all checks written to Commercial Realty Associates / Commercial Realty Association / Commercial Realty Management Inc. (the management agent) with a mismatch of either the payee, the amount or both in the QuickBooks accounting records maintained by the management agent during the specified period.

| | Amount per QuickBooks | Amount per Bank Statement | Amount of Dollar Entry Errors | Number of Transactions |
|---|---|---|---|---|
| Incorrect Payee Entered in QuickBooks | | | | |
| 22 N. Euclid Condo Association | 71,047.00 | $ 71,047.00 | $ - | 37 |
| Blank payees or checks not in QuickBooks | 26,408.00 | 44,582.80 | (18,174.80) | 19 |
| T.E. Williams, Inc. | 18,155.34 | 18,155.34 | - | 11 |
| Crestside Ballwin Heating and Cooling | 17,540.78 | 17,540.78 | - | 10 |
| St. Louis Skylights | 10,144.05 | 10,143.50 | 0.55 | 7 |
| Ronald A. Leggett, Coll | 7,003.82 | 6,682.99 | 320.83 | 3 |
| Kirberg Roofing | 4,665.00 | 4,665.00 | - | 2 |
| Lightner Cleaning Service | 3,442.50 | 3,442.50 | - | 7 |
| Gravois Glass Co. | 2,361.30 | 3,435.00 | (1,073.70) | 2 |
| Reinhold Electric, Inc. | 1,921.50 | 1,921.50 | - | 1 |
| Windows and Gutter Men | 1,575.00 | 1,575.00 | - | 2 |
| Rice Painting Co. | 1,402.00 | 1,402.00 | - | 1 |
| Iceberg Electric Co. | 1,250.00 | 1,250.00 | - | 1 |
| Interface Construction | 1,050.00 | 1,050.00 | - | 1 |
| Weber Fire & Safety Equipment | 861.50 | 861.50 | - | 1 |
| Beetz Plumbing | 844.35 | 844.35 | - | 1 |
| Total incorrect payee entered in QuickBooks | $ 169,672.14 | $ 188,599.26 | $ (18,927.12) | 106 |
| | | | | |
| Understatement of Payments to the Management Agent | | | | |
| Commercial Realty | $ 17,236.00 | $ 19,986.00 | $ (2,750.00) | 26 |
| | | | | |
| | | | | |
| Total incorrect payee entered in QuickBooks | | $ 188,599.26 | | 106 |
| Total understatement of payments to the management agent | | 2,750.00 | | 26 |
| Total under reported payments to the management agent | | $ 191,349.26 | | 132 |



2005 West Broadway, Ste. 100, Columbia, MO 65203
OFFICE (573) 442-6171 FAX (573) 777-7800

3220 West Edgewood, Ste. E, Jefferson City, MO 65109
OFFICE (573) 635-6196 FAX (573) 644-7240

www.williamskeepers.com

# MEMORANDUM

**TO:**      22 N EUCLID LLC FILE

**FROM:**   JOHN VACLAVEK

**SUBJECT:** NOTES FROM JOHN POUND MEETING ON 7/17/2020

**DATE:**    7/18/2020

On 7/17/2020, I met with John Pound at his office in Kirkwood, MO to go over my follow up questions based on our initial findings from our analysis of the documents in the files obtained from John P. on 6/17/2020. The meeting lasted 1.80 hours. The topics for the meeting were based on an outline prepared in advance. The outline is attached to this memo.

Opening Comments - The meeting started out with cordial small talk. After the small talk the meeting went as follows:

#1. Missing COA bank statements - We addressed the missing Busey Bank February 2016 and May 2017, bank statements. These statements were in the files received from John P. but were reprints and did not include the images of checks and deposits. John P. called Damir Krajina at Busey Bank (314-317-4852) and provided approval to Damir to email the statements and images direct to me. Statements are expected to be received early next week.

#2. MSD Dispute – John P. represented he has made progress on the dispute. He has a meeting with the StL Water Division on 7/22/2020 to discuss the possible impact of a meter for the fire suppression system. John P. represented he does not have any of the plumbing drawings so does not know where the meter is located. The invoices from the StL Water Division shows a reading for one meter plus, many invoices have an additional entry for a "fire connection charge" of $42. John P. believes there is a possibility the construction of the neighboring apartment complex was part of the issue for the overcharges and a second meter could be a problem. John P. represented he is building a case with the StL Water Division to coordinate with MSD. As of today John P. had not contacted MSD.

#3. Explanation of our process – I explained the period and process we used to analyze the documents and the QuickBooks file provided in our prior meeting. I also stated we had not completed our analysis and the information I was going to provide today may still change.

#4. QuickBooks entry errors – I told John P. we found 132 checks written to Commercial Realty Associates (CRA) per the image statement provided with the bank statements, but those checks were entered into QuickBooks with another payee. I asked him why this may have occurred but did not get an answer.

American Institute of Certified Public Accountants
Missouri Society of Certified Public Accountants
PKF North American Network

Superior service. Creative solutions. Exceptional clients.

12

**#5. Commissions** – John P. represented at the time he calculated and tracked the lease commissions due and paid but he did not retain it. He did not invoice MIS for lease commissions (we have one invoice from CRA for a lease commission along with the calculation from April 2008 in the file). John P. stated there are no other files to support any of the lease commissions. I asked John P. why he paid himself multiple checks for the lease commissions instead of following the Property Management Agreement (Agreement) calling for the commission to be paid upon lease commencement and occupancy by the tenant and he stated "there was not always enough cash to pay it so he spread it out over time". John P. represented "the 1.5% commission rate was not adequate as the lease commission renewal rate for the area was 5%" so "he tried to keep the commission in the 5% range". I pointed out the rate based on our preliminary findings is currently in excess of 6%.

We went on to talk about the Agreement and the deal he accepted to manage the property, he knew how he was calculating and paying the lease commissions was not per the terms of the Agreement and stated, "he made the changes on his own". He also stated, "he should have talked to Jim about modifying the terms of the Agreement but he had not".

**#6. Hourly Fees** - John P. represented at the time he tracked his time on projects but did not retain any records neither of his time or invoices. I informed him we located 16 invoices for hourly services in the 2011 COA file and all appeared to be for maintenance issues which is not allowed per the Agreement. I told him we found approximately $92K in hourly charges two-thirds of the dollars did not have an invoice. At that point he pulled out his calculator and stated based on the time period "that was only 65 hours per year". I then asked if he had approval for the hourly charges based on the terms of the Agreement and he said he did not have approval from either entity.

John P. represented on occasion Jim would ask him to provide assistance for Richard's building(s)? in Clayton and Jim would tell him to "keep track of your time and bill for your time". John P. stated he had paid for some of his time for the Clayton building(s)? out of 22 N Euclid LLC. When I pointed out the Clayton building(s)? had no relationship to 22 N Euclid LLC entity he stated, "that was the only entity he had control of to pay himself". John P. represented the deal was handled "way too loose" and he "feels he deserved the additional amounts because he was underpaid based on the Agreement". John P. again stated, "he should have discussed with Jim, but he didn't". John P. further stated he knew "it does not comply with the Agreement" and added "he did not say this was the correct way to do it".

**#7. Management Fee** – I asked John P. if he kept track of the payments and he stated he did at the time but did not retain any records. I asked why in eight of the years analyzed he made more than 12 (monthly) payments and in some years the payments were not the monthly charge in effect at the time ($450 beginning agreed upon amount and the rate increased to $550 in 2008)? I also pointed out in some years the monthly charges were $650 and $750. John P. responded by stating "there was so much crossover between entities" (made no sense to me) and he was billing "based on the time being spent which was not the right way".

**#8. Payments to Commercial Realty Associates Without Any Description** – I told John P. there were approximately $53K in payments made to CRA without any description on the check and we did not locate an invoice in the file. John P. said he could look at the checks and may be able to recall but there are no additional records to support them.

**#9. Faithful Performance Bond (Agreement Section V.e.)** – When I asked John P. if the Bond was ever obtained, he said it had not and Jim knew it had not been obtained.

2

#10. Overpayments Found – I informed John P. we had found CRA, based on the terms of the Agreement, had been overpaid as follows:

| | | |
|---|---|---|
| Commissions | $ 214K | |
| Hourly Fee | $ 92K | (none were approved per the Agreement) |
| Management Fee | $ 29K | |
| Pmts w/o Description | $ 53K | (assumed all overpaid since no support) |
| | | |
| Total | $388K | |

I made it clear we were continuing our analysis and at this time we expected the overpayments to CRA to increase.

John P. pulled his calculator out and stated, "this was approximately $28K per year and that while this was not done correctly, they received good service over the years for what was paid".

#11. Any Additional Records – I asked John P. if he had any additional records related to MIS or the COA and he again said he did not. John P. stated he thought Jim Gamble may have approximately five boxes of documents from when he represented the COA but he did not think any of it was accounting related.

#12. Restitution – Based on the MSD meeting next week I decided not to raise the restitution issue to avoid the possibility of jeopardizing progress on that issue.

Closing Comments – The following are comments made by John P. as we were wrapping up:

- "Based on the service provided the additional cost is easily justified".
- "He knows this was not handled correctly and does not comply with the Agreement".
- "Owners have benefited from the service"
- "Little additional investment was required" (based on the management provided).
- "Jim is great to work with".
- "Jim gets me involved with a lot of stuff and Jim always said be sure to charge for your time".

**EXHIBIT B**

**22 N Euclid Management, Inc**

# Fees Paid Re Pound Matter

**All Transactions**

| Type | Date | Name | Memo | Amount | Balance |
|------|------|------|------|--------|---------|
| **6640 · Professional Fees** | | | | | |
| **6662 · John Pound Legal Fees** | | | | | |
| General Journal | 07/07/2020 | Williams Keepers LLC | Williams Keepers Payment | 30,570.37 | 30,570.37 |
| Bill | 07/14/2020 | James G. Rittenbaum | Inv. Date: July 1, 2020 From 05/29/20 to 06/30/20 | 23,175.00 | 53,745.37 |
| Bill | 07/15/2020 | The Beckemeier Law Firm, LC | Invoice #3520 | 1,740.00 | 55,485.37 |
| Bill | 07/28/2020 | James G. Rittenbaum | Inv. Date: July 28, 2020 From 07/1/20 to 07/27/20 | 15,525.00 | 71,010.37 |
| Bill | 08/12/2020 | Williams Keepers LLC | Client # 16986.001 Inv. #203782 | 18,455.65 | 89,466.02 |
| Bill | 08/14/2020 | Fellows & Blake, LLC | Re: 22 N. Euclid from 05/29/20 to 08/14/20 | 28,552.00 | 118,018.02 |
| Bill | 08/24/2020 | The Beckemeier Law Firm, LC | Invoice #3672 | 6,810.00 | 124,828.02 |
| Bill | 08/26/2020 | James G. Rittenbaum | Inv. Date: Aug. 26, 2020 From 07/28/20 to 08/25/20 | 6,637.50 | 131,465.52 |
| General Journal | 09/01/2020 | The Beckemeier Law Firm, LC | Beckemeier Law CC Charge | 8,550.00 | 140,015.52 |
| Bill | 09/11/2020 | Williams Keepers LLC | Client # 16986.011 Inv. #204387 | 1,158.00 | 141,173.52 |
| Bill | 09/14/2020 | Fellows & Blake, LLC | Re: 22 N. Euclid - 08/14/20 to 09/11/20 | 6,137.77 | 147,311.29 |
| Bill | 09/24/2020 | James G. Rittenbaum | Inv. Date: Sep. 24, 2020 From 08/26/20 to 09/23/20 | 5,287.50 | 152,598.79 |
| Bill | 09/24/2020 | The Beckemeier Law Firm, LC | Invoice #3810 | 8,081.25 | 160,680.04 |
| General Journal | 10/12/2020 | The Beckemeier Law Firm, LC | The Beckemeier Law Firm CC Charge | 8,081.25 | 168,761.29 |
| Bill | 10/19/2020 | Williams Keepers LLC | Client # 16986.011 Inv. #205354 | 9,217.00 | 177,978.29 |
| Bill | 10/26/2020 | James G. Rittenbaum | Inv. Date: From 09/24/20 to 10/25/20 | 249.90 | 178,228.19 |
| Bill | 10/30/2020 | Fellows & Blake, LLC | Re: 22 N. Euclid - 09/14/20 to 10/23/20 | 1,248.00 | 179,476.19 |
| General Journal | 11/16/2020 | The Beckemeier Law Firm, LC | Paid The Beckemeier Law Firm With WFB Cr. Card | 5,844.50 | 185,320.69 |
| General Journal | 11/18/2020 | The Beckemeier Law Firm, LC | The Beckemeier Law Firm CC Charge | 390.00 | 185,710.69 |
| Bill | 12/11/2020 | Fellows & Blake, LLC | Re: 22 N. Euclid - 11/09/20 to 12/10/20 | 171.00 | 185,881.69 |
| Bill | 12/29/2020 | James G. Rittenbaum | Inv. Date: From 11/24/20 to 12/28/20 | 225.00 | 186,106.69 |
| General Journal | 12/31/2020 | | Enter Patrick and Patrick fee allocation | 114,000.00 | 300,106.69 |
| Bill | 01/01/2021 | James G. Rittenbaum | Transfered O/S Invoices From RHG To MIS | 20,552.10 | 320,658.79 |
| Bill | 03/24/2021 | Fellows & Blake, LLC | Re: 22 N. Euclid - 12/14/20 to 03/24/21 | 441.00 | 321,099.79 |
| Bill | 03/26/2021 | James G. Rittenbaum | Inv. Date: From 2/26/21 to 3/25/21 | 450.00 | 321,549.79 |
| Bill | 06/23/2021 | James G. Rittenbaum | Inv. Date: From 5/25/21 to 6/23/21 | 1,350.00 | 322,899.79 |
| Bill | 06/28/2021 | Williams Keepers LLC | Client # 16986.011 Inv. #206901, 207708 & 213134 | 8,961.77 | 331,861.56 |
| Bill | 07/13/2021 | Fellows & Blake, LLC | -MULTIPLE- | 1,770.00 | 333,631.56 |
| | | | | | |
| Total 6662 · John Pound Legal Fees | | | | 333,631.56 | 333,631.56 |
| | | | | | |
| Total 6640 · Professional Fees | | | | 333,631.56 | 333,631.56 |
| | | | | | |
| **TOTAL** | | | | **333,631.56** | **333,631.56** |

EXHIBIT C

# COMMERCIAL REALTY ASSOCIATES
**206 West Argonne Ave.**
**Suite 201**
**Kirkwood, Missouri 63122**

# MEMORANDUM

DATE:   September 2, 2020

TO:     **Bradley Blake**
        **Attorney at Law**

FROM:   **John Pound**

RE:     **# 22 North Euclid Commercial Condominiums**
        **22 North Euclid Management, Inc.**

---

Our company has served as the property manager for the two subject entities and as the leasing representative for 22 North Euclid Management, Inc. from January 1, 2003 through July 31, 2020. During that time we provided excellent property management services for entities as well as the condominium owners and the tenants of 22 North Euclid Management, Inc. Even though the building is not large, it can be very challenging to manage. At times the building requires almost daily attention due to the needs of the tenants, condominium owners and the age of the building. At times the mixed uses of the tenants, ranging from the clinical use of the large dental office, the administrative offices of Washington University and the small commercial tenants are not always compatible. The management policies that may be good for one tenant are not always good for the other tenants. The parking garage which has 52 spaces which are allocated to the condominium owners and tenants can also be a source of disputes between the tenants and owners.

## PROPERTY MANAGEMENT SERVICES

It soon became apparent providing the property management services for 22 North Euclid can take a substantial amount of time. The basic bookkeeping alone involves preparation of monthly invoices for rentals and condo dues, collections of the rents / dues, making the bank deposits and making payments to15- 18 vendors per month. This does not include any of the other typical property management responsibilities required for office and commercial properties. Based on our experiences, the average time commitment per month for the property management of 22 North Euclid is approximately 30-35 hours for both entities. Please note this does not include time required for leasing activities or special assignments or projects.

You had given me a schedule of fee payments dated July 27, 2020 by both 22 North Euclid Management, Inc. (f/k/a Manageable Information Systems, Inc.) (hereinafter "Management, Inc.") and 22 North Euclid Condominium Association (hereinafter "Condo Assc."). This schedule was prepared by your accountant and was for the time period of January 2006 through June 30, 2020, a time period of 14 years and 6 months. The schedule further notes records were not available for Management Inc. for the period of January 2012 through February 2013 (14 months) and for the Condo Assc. from January 2012 through December 2014 (36 months). You requested that I provide comments concerning these additional fees.

In order to obtain a more accurate indication of the fee payments on an annualized basis, the payments by each of the entities were amortized over the time periods for which records were available. The "Management Fees" were than amortized over 12 months for each year to determine the average monthly fee amounts.

A similar approach was used for the "Hourly Fees" and the "Additional Payments" for each of the entities. When the average monthly amount for each of these fees was determined for each entity, the monthly amounts were then divided by $115.00. This amount is the approximate average fee charged for real estate consulting services and other special assignments during the 14 years 6 months of the accounting study. The consulting fee specified in the original property management contracts in 2003 was $90.00 per hour and our fee for such services today in 2020 is $130.00 per hour.

### Management Fees

| | | |
|---|---|---|
| Management Inc. | $14,150 / 13.17 yrs. = $1,074 yr. / 12 mos. = $90.00 /mo. |
| Condo Assc. | $20,150 / 11.5 yrs. = $1,752 yr. / 12 mos. = $146.00 / mo. |

### Hourly Fees

| | | |
|---|---|---|
| Management Inc. | $39,832 / 13.17 yrs = $2,024 yr. / 12 mos = $252 (2.19 hrs.) |
| Condo Assc. | $61,688 / 11.5 yrs. = $5,364 yr. / 12 mos = $447 (3.89 hrs.) |

### Additional Payments

| | | |
|---|---|---|
| Management Inc. | $101,779 / 13.17 yrs. = $7,728 yr / 12 mos = $649 (5.5 hrs.) |
| Condo Assc. | $19.950 / 11.5 yrs = $1,735 yr / 12 mos = $145 (1.26 hrs) |

As the results of the above analysis show, the average monthly "Management Fees" paid by each entity over the term of the accountants' schedule were relatively small considering the time requirements of the property management services.

The "Hourly Fees" and the "Additional Payments" both are the result of work involved with miscellaneous real estate consulting or special assignments involved with the 22 North Euclid Condominium Building. In a few cases, some of this work and the resulting fees, were involved with assignments for other specific properties such as two office buildings in Clayton, Mo., in which Mr. Goldstein is an investor. Please note the time and monetary amounts shown on the above schedule are average amounts per month but can certainly vary from month to month depending on the work involved at various times.

The "Hourly Fees" and "Additional Payments" were for a wide range of subjects and services By way of example, but certainly not a complete listing, these included the following:

1    Serving as the president of the 22 North Euclid Condominium Association and handling communications with the owners concerning all matters with the condominium association .

2.    Preparation for and conducting the annual Condominium Owners and Board of Directors meetings. This includes preparing and distributing notices of the meetings and proxy ballots, preparing agendas, preparing and distribution of the meetings and any necessary follow up with the owners.

3.    Research and prepare summary of market conditions for office and retail properties in the Central West End and Clayton areas.

4.    Attend weekly construction meetings and serve as the building representative during the extensive remodeling of the Washington U. suite in 2017.

5.    In depth review of the condominium by-laws and condominium indentures. This included working with a title company to research old documents and reorganizing the files for these documents.

6.    Attending construction meetings and serving as the owners' representative during the construction of the new apartment building across the ally from 22 N. Euclid known as The Euclid. This included numerous meetings and phone calls during the 2 + year design and construction schedule.

7.    Review of the appraisal and financial proformas for the office buildings located at 8132 Maryland Ave. and 8235 Forsyth Blvd. in Clayton, Mo. in which Mr. Goldstein is an investor.

8.    Research current status and condition of a property in Jefferson County, Mo., known as Chesley Island in which Mr. Goldstein is an investor. This required a trip to the Jefferson County courthouse in Hillsboro, Mo. and a physical inspection of the property.

9.    Working with the insurance consultants and brokers on a bi-annual basis to re-bid and analyze bids for the casualty and liability insurance for the condominium association.

10.    Various telephone conversations with representatives of Enterprise Bank to discuss the status of American Dental, Washington U. and Pickles

relative to their leases and the loan Mr. Goldstein has with Enterprise. Also, general market conditions for retail and office properties in the Central West End market area.

## LEASING SERVICES

Most all commercial real estate investors agree, the keys to a successful investment are:

1. Keep the property leased with successful tenants which pay their rent on time.
2. Minimize the time any rental space is vacant and not producing income
3. Minimize the amount of investment in improvements for tenants (even if it seems the improvements might have some residual value when the tenant leaves

Based on the above factors, Mr. Goldstein's investment at 22 North Euclid has been very successful the past 20+ years. The total rental income during that time has been approximately $5,650,000 (includes Washington U., American Dental Partners and Pickles Deli). The only vacant space during the 20+ years was approximately 1,900 sq. ft. for approximately 2 ½ years which was part of the Washington U. suite which they had vacated when they were planning to move out of the building. The only tenant improvement allowances granted to any of these tenants was a rent credit in the amount of $46,100 to American Dental and a rent credit in the amount of $4,000 granted to Pickles Deli for new flooring in their store. The rent for Washington U. was abated during the time in 2017 when they extensively remodeled their suite (at their sole expense) and it could not be occupied.

American Dental Partners (or a predecessor firm) has been a tenant in Mr. Goldstein's condominium units since May of 1998 and by the time their current lease expires in April 2023, they will have been a tenant for 25 years. Washington University has been a tenant in Mr. Goldstein's units since April of 2001and has expanded its suite size on three occasions. Pickles Deli has been a tenant for 13 years.

These long term tenants are unheard of in today's volatile commercial real estate market. While 22 North Euclid is well located for all three of these tenants, they have all certainly had other attractive alternative location options available to them over the years. None of these tenants would have continued their tenancy at 22 North Euclid if they had not been pleased with the property management services and the relationship with the landlord.

We were very close to losing both Washington U. and American Dental 3-4 years ago. Washington U's lease was due to expire December 31, 2016 They had told us 2 years prior to that they would probably not renew the lease as they were planning to develop a new administrative office building on their main campus three blocks away. By the fall of 2016 they had already relocated most of their employees away from 22 North Euclid. Their new building did encounter some construction delays but Washington U. told us they would completely vacate 22 North Euclid by the spring of 2017.

The lease with American Dental Partners was due to expire April 30, 2018 and they informed us about a year in advance of that date that they would probably not renew as they were considering moving to a new building in the Cortex Innovation Center about three blocks to the east. Cortex is a large, new multi-building development by a partnership of Washington U. and BJC HealthCare. American Dental had been located at 22 North Euclid for 20 years and they thought a new building would be good for their image and employee morale. They thought they could also reduce the size of their office suite by 20-25% with an efficient new design and realize a savings in their rent.

Obviously, losing these two large tenants would have been a significant blow to Mr. Goldstein's investment. Also, Enterprise Bank was very concerned as their loan to Mr. Goldstein was largely dependent on having the security of these two tenants. The Enterprise loan officer was following the situation closely and was contacting me on a regular basis for updates.

I had been keeping Jim Rittenbaum well informed of the status of the two leases with the Washington U. lease being the most critical importance since it expired the soonest. I formulated several ideas of how we might work out some sort of new lease, even if it was for a shorter term and for a smaller size suite although I was not optimistic. He authorized me to have a discussion with Washington U. to explore my ideas.

Fortunately, I had maintained a good relationship with a former facilities management person with Washington U. This person had nothing to do with the office suite at 22 North Euclid but he was able to give me some insight to how a lease deal might be structured to assist Washington U. in some of their long term planning objectives. Without going into great detail in this memo, suffice to say, after several conversations with Washington U., we were able to negotiate a very attractive new lease for both them and Mr. Goldstein. The new term was for 5 years and 6 months which very much pleased Enterprise Bank. The Washington U. office suite was close to 20 years old and badly needed remodeling. Washington U. agreed to completely renovate the entire suite at its sole expense but insisted that they would not be charged rent during the construction time as the suite could not be occupied as new occupancy permits would be required upon its completion.

Our next challenge was then to finalize a lease with American Dental Partners. While Enterprise Bank was pleased with the new lease with Washington U., they were still concerned about the possibility of losing American Dental. The Washington U. lease, by itself, was not sufficient security for Mr. Goldstein's loan. Also, if American Dental relocated, the cost of remodeling that suite for a new tenant would be significant as it had been designed and constructed specifically for a dental office with many small operatory rooms and special improvements.

Unfortunately, American Dental contracted for their real estate services with Colliers International, a large real estate and facilities management firm in Dallas, Texas. I did not have any good contacts with Colliers and had to rely on my contact person in the 22

North Euclid office, even though she did not have any active involvement with the location decision. I was aware the Colliers person had recommended that a move to a new building would be good for American Dental's practice. The rental cost, however, of a new building would be significantly higher and the construction cost of building the dental office improvements would also be very expensive.

I formulated what I thought was a good proposal with Jim Rittenbaum and, after some discussion, he authorized me to submit it to American Dental. For this proposal, we were fairly confident that whatever we offered would be more economically attractive than a new building proposal. The question was how much more economically attractive did our proposal need to be in order to offset the "non-economical" attractiveness of the new building. I did not have much confidence our proposal would be chosen.

American Dental and Colliers International never shared with me all of their considerations in making their analysis but their final decision was to keep their Central West End office at 22 North Euclid. They did require that the landlord provide a remodeling allowance as their suite needed new light fixtures, new ceiling pads, re-painting and some new floor covering. They initially requested $12.00 per square foot of leased area which totaled about $96,000. We were able to negotiate that down to about $48,000 and convert it to a rent credit, rather than cash, to be paid over the first eight months of the new lease. It should be noted this is the only tenant improvement contribution made by Mr.Goldstein to American Dental in its 25 years of being a tenant at 22 North Euclid.

By successfully retaining both of these tenants for new 5+ year lease terms, Mr. Goldstein's excellent real estate investment at 22 North Euclid is assured to continue for 2-3 more years. The new leases also allowed Mr. Goldstein and Jim Rittenbaum to renegotiate the terms of the loan with Enterprise Bank which certainly seemed pleased with the terms of the new leases.

As was discussed in the preceding paragraphs, both Washington U. and American Dental Partners were planning to relocate their offices away from 22 North Euclid. Washington U. had already moved most of its employees out of the building by the time its lease expired on December 31, 2016 and American Dental had informed us they intended to relocate when their lease expired on April 30, 2018. Based on that information from these tenants and the subsequent complexities of our efforts to retain them at 22 North Euclid, the lease agreements we were finally able to negotiate with them should both be considered as "new" leases for purposes of calculations of the lease commissions due. The terms of both transactions are certainly favorable to Mr. Goldstein and the leases were very significant to his continuing relationship with Enterprise Bank.

The total rental which will be paid by Washington U., American Dental and Pickles Deli from January 1, 2006 through the expiration of the current lease terms will be approximately $4,842,000. (Note: This amount only includes the rental paid by Pickles

Deli through the expiration of its previous lease which was June 30, 2020 even though Pickles continues to occupy its premises on a month- to- month basis.)  The lease commission amount shown in your accountant's report (dated July 27, 2020) equates to approximately 4.58% of the rental paid by the three tenants.  If the commission amount is averaged over the 13.17 year time period of the accountants report (when records were available for Management, Inc.), the average commission per year is $16,840,00 or $1,403.00 per month.

## CONCLUSION

The total fees for property management and leasing services for 22 North Euclid  during the past 14 ½ years have been higher than were specified in the original contracts but both the management and leasing services have been excellent.  While making accurate comparisons with other similar properties in the St. Louis area over the same period of time would be difficult and require a great deal of research, I am quite confident the fees paid for 22 North Euclid would be very comparable to and possibly less than the other properties when all of the additional services are included.  I also believe the performance of Mr. Goldstein's investment at 22 North Euclid would be enviable and considered as "outstanding" by most other real estate investors in the St. Louis market during the period of time.

Some of our record keeping, some of our business practices, invoicing and communications with Mr. Goldstein's local representative should certainly have been much better.  I apologize for that and can assure you those mistakes and oversights will never happen again.  I believe It is important, however, to consider all aspects of the services which have been provided and keep the results of Mr. Goldstein's investment in perspective with the services.

Thank you and Mr. Goldstein for your consideration.

John E. Pound